UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHNNY BURKE,

                    Plaintiff/Counter-Defendant,        Case No. 16-cv-11220

v                                       Honorable Thomas L. Ludington

CUMULUS MEDIA, INC.,

                    Defendant/Counter-Plaintiff.

and

BONNIE HOLZHEI,

                    Plaintiff/Counter-Defendant,        Case No. 16-cv-11221

v                                       Honorable Thomas L. Ludington

CUMULUS MEDIA, INC.,

                    Defendant/Counter-Plaintiff.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS
FOR PRLELIMINARY INJUNCTIONS**

      On February 18, 2016 Plaintiffs Johnny Burke and Bonnie Holzhei (together "Plaintiffs")
commenced separate actions against their former employer, Defendant Cumulus Media, in
Michigan state court in the county of Saginaw. *See Burke v. Cumulus Media, Inc.,* 16-cv-11220
(April 4, 2016), ECF No. 1; *Holzhei v. Cumulus Media, Inc.,* 16-cv-11221 (April 4, 2016), ECF
No. 1.  Plaintiffs allege that Defendant terminated their employment as morning radio hosts at a
local broadcast station, WHNN-FM/96.1 of Saginaw, Michigan ("WHNN"), because of their
ages in violation of the Elliot Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* ("ELCRA").
Plaintiff Holzhei also claims that Defendants discriminated against her because of her gender in

violation of ELCRA.  Defendant removed the actions to this Court on April 4, 2016, asserting diversity jurisdiction under 28 U.S.C. § 1332.

On April 11, 2016 Defendant Cumulus Media filed answers to Plaintiffs' complaints, along with fourteen counterclaims. *See* ECF No. 4.  Defendant's counterclaims rest on allegations that, by broadcasting an internet morning show following their termination, Plaintiffs are in violation of non-compete agreements between the parties and have impermissibly accessed Defendant's confidential business information. *Id*.  Defendant then filed motions for preliminary injunctions against each Plaintiff on April 18, 2016, seeking an order (1) enjoining Plaintiffs from continuing to broadcast the Internet Show in violation of their employment agreements; (2) enjoining Plaintiffs from continuing to use Cumulus's confidential information, continuing to use the name "Blondie", and continuing to solicit Cumulus's current and former advertisers; (3) requiring Plaintiffs to make a detailed accounting of income generated from their competing activities; (4) requiring Plaintiffs to return all of Cumulus's confidential documentation and any record of trade secrets; (5) allowing the immediate commencement of discovery; and, as to Holzhei alone (6) awarding Cumulus attorney's fees, costs and interest pursuant to her employment agreement. *See* ECF No. 8.

## I.

The material facts are not in dispute.  WHNN is a broadcast station that has operated out of the Saginaw area for more than six decades.  *See* Countercl. ¶ 10.  WHNN was originally owned and operated by Citadel Broadcasting.  In 2011 Defendant Cumulus acquired Citadel Broadcasting, thereby becoming the owner and operator of numerous Michigan-based radio stations including WHNN.  *Id*. at ¶ 8. Following the acquisition Cumulus continued to use the call sign WHNN in association with all programming on the broadcasting station. *Id*. at ¶ 11.

**A.**

Plaintiffs Burke and Holzhei are residents of Saginaw Michigan.  *See* Compl. ¶ 5. Burke, who had served as a radio host on WHNN for around two decades, was known for the morning radio show he hosted, "Johnny Burke and the Morning Crew" (the "Radio Show").  *See* Countercl. ¶ 13.  The Radio Show featured regular on-air participants, including Plaintiff Holzhei who appeared under the alias "Blondie."  *Id*. at ¶¶ 14-15.  The Radio Show followed a regular format, with distinctive, recurrent segments based on the time of day or the day of the week. *Id*. at ¶¶ 16-17.  Defendant's witness Julia Richardson acknowledged that Plaintiffs are "legends" in local radio.

**i.**

Prior to Cumulus's acquisition of Citadel Broadcasting, on March 16, 2010 Holzhei entered into an employment agreement with Citadel Broadcasting.  *See* H. Employment Agreement, ECF No. 8 Ex. A. Pursuant to the agreement, Holzhei earned $31,000 in annual compensation.  *Id*. at ¶ 4. From March 16, 2010 to March 15, 2011, Holzhei could only be terminated for specific cause or through use of specific procedures, after which the employment reverted to "at-will." *Id*. at ¶¶ 2, 8.

Holzhei's employment agreement contains the following non-compete agreement that prevents her from competing with Defendant Cumulus for an unconditional period of one year following the termination of their employment relationship:

> To the extent permitted by law, Employee agrees that while employed by the Company and following termination of Employee's employment for any reason that for a period of at least three (3) months, plus an additional three (3) months for each additional year of employment with the Company, not to exceed a maximum of one (1) year, Employee shall refrain, directly or indirectly, whether as principal, agent, consultant, contractor, employee, or otherwise, alone or in association with or on behalf of other(s), from appearing, performing, or allowing Employee's voice or picture to be heard, broadcast, used, or transmitted live or by

recording in or on any radio station located within the Restricted Area.  For purposes of this Section 12(b), "any radio station located within[ ] the Restricted Area" shall be defined to mean a radio station whose main transmitter is located within a sixty (60) mile radius of the Station's main transmitter. The terms of this Section shall survive any termination or expiration of this Agreement. Employee acknowledges and agrees that the obligations set forth in this Section 12 will not in any way preclude Employee upon termination of employment from engaging in a lawful profession, trade, or business of any kind, or from becoming gainfully employed.   Employee understands and agrees that 10 percent (10%) of Employee's salary… is being paid by Employer in consideration for the post-term protection and exclusivity provisions of this Agreement as well as for the other covenants set forth in this Agreement.

*See* Employment Agreement ¶ 12(b). Her employment agreement also contains the following provisions limiting her ability to solicit Defendant's customers and employees for a one-year period:

> (a) <u>Non-Solicitation of Customers</u>.  Employee agrees that during his/her employment with the Company and for a period of one (1) year following termination of Employee's employment with the Company for any reason, Employee will not, without the express written consent of Employer, directly or indirectly, either on Employee's own or on behalf of any other person or entity, contact, solicit, call upon, communicate with, or attempt to communicate with any employee, contractor, or agent of any customer of Employer for purposes of providing any service competitive with Employer's business.  The terms of this section shall survive any termination or expiration of this Agreement.

> (b) <u>Non-Solicitation of Employees</u>.  Employee agrees that during his/her employment with the Company and for a period of one (1) year following termination of Employee's employment with the Company for any reason, Employee will not directly or indirectly, either on Employee's own behalf or any other person or entity Solicit… any person who is at the time or within the immediately preceding thirty (30) days was an employee of Employer.  The term "Solicit" shall be defined to include the following: (i) hire or employ, offer to hire or employ, or attempt to hire or employ; (ii) assist any person in hiring or employing; (iii) contract with; or (iv) induce to leave employment. The terms of this section shall survive any termination or expiration of this Agreement.

*Id.* at ¶ 13.  Holzhei's employment agreement also contains a restrictive "Advertising and Publicity" provision:

Employee agrees that Employer has the exclusive right to use and license others to use Employee's name, professional name, nickname, recorded voice, biographical material, performances, portraits, pictures, and likeness for purposes of trade, advertising, promotion and publicity in connection with the institutions, services and products of Employer and its sponsors; provided, however, that no direct endorsement by Employee of any product or service shall be used without Employee's consent.  Employee agrees that Employee shall not use or authorize the use of Employee's name, professional name, nickname, recorded voice, biographical material, performances, portrait, picture, or likeness to advertise, promote, or publicize in any manner, any institution, product, or service for any person or entity other than Employer or its affiliated entities without obtaining the prior express written consent of Employer.  Employee shall not authorize or release any advertising or promotional matter or any other publicity in any form with reference to Employee's services hereunder or the Programs of Employer without Employer's prior express written approval.

*Id.* at ¶ 14.

Holzhei's employment agreement also contains the following "Property Rights" provision. Pursuant to that provision, any program and announcement created and rendered by Holzhei as part of her employment "(including every format, idea, theme, script, characteristic, element thereof)" is solely and exclusively owned by the employer. *Id.* at ¶ 15(a).  That provision further provides:

[a]t no time, during the Term or thereafter, shall Employee, directly or indirectly, render any service on or in connection with any radio program that is identified by any name or title confusingly similar to the name or title of a program on or in connection with which Employee has rendered services for Employer or station. Notwithstanding the foregoing, Employer shall have no control over the use by Employee of Employee's real name or any other intellectual property owned by Employee after termination or expiration of this Agreement.

*Id.*

Holzhei's employment agreement also contains a provision restricting her ability to use certain confidential information as follows:

Employee acknowledges that, in the course of Employee's employment, Employee shall have access to and be entrusted with confidential information, trade secrets, records, data, specifications…and other knowledge, including, but not limited to, business plans, marketing plans and methods, special pricing or

- 5 -

rate arrangements, programming strategies, studies or surveys, proprietary research, financial affairs…customer or advertising lists, current or prospective customer/advertiser contacts and preferences, and programming or promotional plans (["Confidential Information"]) owned by or in the possession of Employer. All confidential information shall be and remain the sole and exclusive property of Employer[.] Employee agrees that during his/her employment with the Company and for a two (2) year period after Employee's termination of employment for any reason, Employee shall not, without the prior written consent of Employer, disclose to any individual or entity for any reason or purpose whatsoever, or use for [her] own benefit or for the benefit of any other person or business…any Confidential Information of Employer."

*Id*. at ¶ 16.

Finally, Holzhei's Employment Agreement contains a provision specifically authorizing her employer to seek injunctive relief and monetary damages in the event of a breach of the agreement:

Employee recognizes that the services to be rendered by Employee hereunder are of special, unique, unusual, extraordinary and intellectual character, are of an artistic and professional nature, require skill of the highest order, and further are of peculiar value, the loss of which cannot be adequately compensated for in damages…in the event of any breach of the provisions of this Agreement by the Employee, Employer shall be entitled, if it so elects, to institute and prosecute proceedings…to obtain damages, attorney's fees, costs, to enforce specific performance of such provisions, to restrain and/or enjoin Employee[.] Because a remedy at law for any breach of this provision may be inadequate, Employee agrees that…Employer shall have the remedies of a restraining order, injunction or other equitable relief to enforce the provisions hereof without posting bond and without the showing of irreparable injury.

*Id*. at ¶ 18.

Holzhei's Employment Agreement specifically states that it is assignable to any entity that succeeds to ownership of the employer, and that such assignment could be effected without consent of Holzhei and without any additional consideration or notice to Holzhei. *Id*. at ¶ 19.

**ii.**

Unlike Holzhei, Burke entered into a new employment agreement with Defendant in 2012. On June 21, 2012 Scott Meier, the regional vice president of Defendant Cumulus, sent a

- 6 -

memorandum to Burke regarding his compensation plan. *See* B. Compensation Memo, ECF No. 4 Ex. B. The plan provided that Burke would have a base salary of $125,000 per year. *Id*. Five percent of Burke's base salary was to be in consideration for Burke's agreement to be bound by a exclusive negotiation provision and a six-month non-compete agreement. *Id*. The non-compete agreement provided, in relevant part:

> For a period of 6 months after the termination of your employment with Cumulus, you shall not enter into the employment of, perform services for, enter into any oral or written agreement for services with, give or accept an option for services or grant or receive future rights of any kind to provide services to or from any person or entity engaged in the operation, promotion, or marketing of commercial radio, unless and until you have first promptly disclosed the terms thereof to Cumulus and offered in writing to resume your reemployment with Cumulus on terms that are substantially similar to those of any bona fide offer that you have received or option or rights that you intend to grant or accept.

*Id*. The compensation memorandum also contained a termination provision, providing "[a]t the time your employment ends, you will be paid your Base Salary through your last day worked." *Id*. The compensation memorandum concluded with a space for Burke's signature, above which is set forth:

> I understand and voluntarily accept the foregoing compensation plan as outlined above. I acknowledge that this Memorandum, the Cumulus Handbook, and the Confidentiality, Non-Competition, and Non-Solicitation Agreement set forth the full terms of my employment with Cumulus, and supersedes all previous inconsistent agreements, understandings, terms or conditions, either express or implied. I further understand that my Market Manager can modify this compensation plan at any time without notice, unless required by law. Finally, I acknowledge the fact that nothing in this document alters the fact I am an "at will" employee, meaning that Cumulus or I may terminate this employment relationship any any time for any reason.

*Id*. Burke signed the compensation memorandum on June 25, 2012.

Burke also entered into a Confidentiality, Non-Competition, and Non-Solicitation Agreement (Burke's "employment agreement"), as referenced in the compensation memorandum. *See* B. Employment Agreement, ECF No. 8 Ex. A. The employment agreement

- 7 -

was signed by the regional vice president of Citadel Broadcasting on June 27, 2012, and by

Plaintiff Burke on an unspecified date. After acknowledging that Burke's employment was to

remain "at-will," the employment agreement provides as follows:

> WHEREAS Employee and the Company agree that the approval, acceptance, and goodwill developed by the Company's program directors and radio announcers with the Company's listening audience and customers/sponsors is a valuable asset of the Company's business, and essential to the Company's success in its highly competitive market;

> WHEREAS Employee will develop such approval, acceptance, and goodwill for the Company and at the Company's expense;

> WHEREAS Employee and the Company agree that the Company's confidential business information is also a valuable asset of the Company's business, and essential to the Company's competitive success;

> WHEREAS Employee will have access to the Company's confidential business information;

> WHEREAS the Company would suffer irreparable harm if Employee were to misuse the approval, acceptance, and goodwill that Employee develops on the Company's behalf, or the confidential information that Employee obtains while in the Company's employ, to compete unfairly against the Company;

> WHEREAS Employee has gained, or will gain, relationships with other Company employees and knowledge of the Company's relationships with other employees, which relationships and knowledge could be misused to disrupt the Company's operations if Employee were to solicit other employees for employment by a Competitor of the Company;

*Id.*

Burke's employment agreement contains a number of definitions. *Id.* at ¶1. It defines the

"Company Business" as "the operation, promotion, and marketing of commercial radio stations."

*Id.* It defines the "Business Area" as "the area within a 50-mile radius of the Company's

WHNN-FM transmitter located at 9622 Dutcher Road in Fairgrove, MI" and provides that

"Employee and the Company agree that Employee has carried out or will carry out the Company

Business throughout the Business Area by broadcasting programming and advertising heard

throughout the Business Area, by soliciting sponsors/customers from throughout the Business Area, and/or by organizing or conducting promotional events throughout the Business Area." *Id*. "Competing Business" is defined as "any person (including Employee) or entity carrying on a business that is the same or essentially the same as the Company Business."  "Confidential Information" is defined as

> All information that: (i) the Company endeavors to keep secret; and (ii) has commercial value to the Company or is of such a nature that its unauthorized disclosure would be detrimental to the Company's interest, including, for instance, the Company's information concerning price and discount arrangements with sponsors/customers, information concerning sponsors'/customers' particular needs, preferences and interests (and how the Company uses such information to maintain a competitive advantage), marketing plans, business strategies, promotion plans, financial information, forecasts, and personnel information. Confidential Information does not include information that (i) is in or enters the public domain other than by breach of this Agreement; or (ii) is known or becomes known to Employee from a source other than the Company provided that the source does not make the information known to the Employee in violation of a contractual or other legal duty owed to the Company.

*Id*.  The final definition provided in the employment agreement, "Job Duties" includes "[p]erforming a daily live on-air shift on the Station Monday-Friday, as determined and directed by the Company from time to time" and "working on show preparation and production." *Id*. Burke was to "render all artistic, creative, and professional services for the Company and for the Station, including without limitation, for the production of programming on behalf of the Company and the Station." *Id*. Burke also agreed "that Employee has been assigned and will carry out these Job Duties on Behalf of the Company."  *Id*.

The employment agreement then contains four provisions governing Burke's conduct for the duration of his employment and for a period following the termination of his employment. First, there is a provision requiring the protection of Cumulus's confidential information:

> **Non-Disclosure.** During Employee's employment by the Company, and for one year after termination of such employment, Employee shall not, directly or

indirectly, disclose any Confidential Information to any person or entity, or use or allow others to use through Employee any Confidential Information, except as necessary for performance of Employee's Job Duties.

*Id.* at ¶ 2.1. Second, Burke's employment agreement contains the following agreement not to compete:

> **AGREEMENT NOT TO COMPETE**. While employed by the Company, and for 6 months following termination of such employment ("Non-Compete Period") Employee shall not, directly or indirectly, within the Business Area, engage in any activities the same or essentially the same as Employee's Job Duties for any Competing Business; *provided*, however, in the event the Company terminates Employee without "Cause"…, the Non-Compete Period shall be enforceable against Employee for a period of up to 6 months only in the event and to the extent that the Company, in its discretion, elects to pay to Employee his base salary during such period. Employee further agrees that during the pendency of any litigation to enforce this Section [], including all appeals, the non-compete period identified herein shall automatically be tolled for such period of time until the litigation is fully and finally resolved.

*Id.* at ¶ 3. Third, the employment agreement contains an agreement not to solicit customers:

> **AGREEMENT NOT TO SOLICIT CUSTOMERS**. During Employee's employment by the Company and for 6 months following termination of such employment, Employee shall not, directly or indirectly, for any Competing Business, solicit, for the purpose of selling advertising time, any customer of the Company whom Employee had Contact on the Company's behalf during the two years preceding Employee's termination of Employment.

*Id.* at ¶ 4. Like the agreement not to compete, the agreement not to solicit customers also contains a provision tolling the 6-month period during the pendency of any litigation. *Id.* Unlike the agreement not to compete, the agreement not to solicit customers is not conditioned on the Company's election to pay Burke his base salary during the 6-month period. *Id.*

Finally, Burke's employment agreement contains an agreement not to solicit fellow employees:

> **AGREEMENT NOT TO SOLICIT EMPLOYEES**. During Employee's employment by the Company and for 6 months following termination of such employment, Employee shall not, directly or indirectly, solicit for employment by a Competing Business any of the Company's sales, programming, managerial, or

on-air employees with whom Employee dealt during the 12 months preceding Employee's termination of employment with the Company.

*Id.* at ¶ 5.  Like the preceding, the agreement not to solicit customers also contains a provision polling the 6-month period during the pendency of any litigation, but is not conditioned on the Company's election to pay Burke his base salary during the 6-month period.  *Id.*

As part of his employment agreement, Burke agreed that the preceding provisions were "reasonably necessary to protect the Company's property and business interests, and that Employee's breach of any of [the] provisions will cause the Company to suffer irreparable loss and damage." *Id.* at ¶ 8.  He therefore agreed that "if Employee breaches or threatens to breach any of the provisions…, the Company shall be entitled to immediate injunctive relief to enforce this Agreement, money damages for whatever harm such breach causes the Company, and whatever other remedies are available." *Id.*  Burke also agreed "to pay all costs, expenses, and/or charges, including reasonable attorneys' fees, incurred by the Company in successfully enforcing any of the provisions hereof." *Id.* at ¶ 14.

### iii.

The differences between the two Plaintiff's employment agreements are material to this action. While Burke earned a base salary of $125,000 per year, Holzhei earned a base salary of only $31,200. Despite the fact that Holzhei received significantly less compensation than Burke, she is subject to a more extensive non-compete agreement than Burke. While Burke's non-compete prevents him from competing with Defendant for a period of 6-months after the termination of his employment only if Defendant chooses to pay him for that 6-month period, Holzhei's Employment Agreement prevents her from competing with Defendant Cumulus for an unconditional period of one year. In its preliminary injunctions motions, Defendant only seeks to enforce Holzhei's non-compete, and not Burke's.  Holzhei's employment agreement is more

- 11 -

restrictive than Burke's in other ways as well, containing a longer term non-solicitation provision, greater restrictions on her use of Cumulus's information, and specific restrictions on her ability to use Cumulus's intellectual property, and her name, professional name, and nickname for advertising and publicity purposes.

**B.**

Defendant alleges that after the Radio Show received declining ratings in 2013, it encouraged Burke and Holzhei to use alternative broadcasting technology to enhance the show, including recording Podcasts and posting video content on Facebook and Periscope. *See* Countercl. ¶¶ 18-21. Defendant also alleges that it also encouraged Burke to play more music on the show. *See* Tr.  While Plaintiffs accepted the recommendation to promote the Radio Show and broadcasting content on Periscope in 2015, Defendant alleges that Plaintiffs rejected its recommendation that they play more music. *Id*. at ¶ 21.

Defendant Cumulus terminated Plaintiffs' employment on January 15, 2016.  Defendant alleges that Plaintiffs were terminated after the Radio Show continued to receive declining ratings, and after Plaintiffs refused to accept Defendant's suggestion to play more music. *See* Countercl. ¶¶ 18-21.  Plaintiffs allege that they were terminated because of their ages in violation of ELCRA, as evidenced by the fact that Defendant Cumulus replaced them with two individuals in their 30's.  *See* Coml. ¶¶ 19-20.  Plaintiff Holzhei also argues that Defendant discriminated against her because of her gender in violation of ELCRA.

Soon after their terminations, Holzhei and Burke began webcasting a morning audio show via Periscope called "Johnny and Blondie Live" (the "Internet Show").  *See* Resp. to Mot. 1, ECF No. 13.  The Internet Show follows a similar format to the former Radio Show, and Holzhei continues to use the name "Blondie." *Id*.  Defendant alleges that the Internet Show

features the same promotional events, guests, programming content, theme, and schedule as the former radio show. *See* Mot for Prelim. Inj. 3. Defendant further alleges that Plaintiffs use Cumulus's FCC registered call sign "WHNN" in association with their Internet Show. *Id.* Finally, Defendant alleges Plaintiffs have solicited Cumulus's advertisers by using Cumulus's confidential information in violation of the Employment Agreement, and that Cumulus has already lost at least one advertiser due to their conduct. *Id.*

## C.

In response to their terminations, on February 18, 2016 each Plaintiff filed suit against Defendant Cumulus in Saginaw County Court. Cumulus removed the actions to this Court on April 4, 2016 asserting diversity jurisdiction under 28 U.S.C. § 1332. *See* ECF No. 1. Also on that date Cumulus sent cease and desist letters to Plaintiffs, arguing that through broadcasting "Johnny and Blondie Live" they were in violation of non-compete provisions contained in the parties' employment agreements.

Defendant Cumulus filed answers to Plaintiffs' complaints on April 11, 2016. *See* ECF No. 3. Cumulus also filed the following fourteen counterclaims relating to the broadcast of "Johnnie and Blondie Live": (1) Breach of provisions in the parties' employment agreements restricting their ability to compete with Cumulus; (2) Tortious interference with Cumulus's contracts with sponsors and advertisers; (3) Tortious interference with business relationships and expectancies with Cumulus's listener base, customers, sponsors, and potential sponsors; (4) Unjust enrichment; (5) Unfair competition; (6) Violation of the Michigan Consumer Protection Act; (7) Misappropriation of trade secrets in violation of Michigan's Uniform Trade Secrets Act, M.C.L. § 445.1901 *et seq.* ("UTSA"); (8) Violation of the Anti-Cybersquatting Protection Act, 15 U.S.C. § 1125(a), through the use of the call sign "WHNN"; (9) Trademark infringement;

(10) Statutory conversion of confidential information under M.C.L. § 600.2919(a); (11) Common law conversion of proprietary, confidential information; (12) Civil conspiracy to commit the foregoing; (13) A request for accurate accounting of Plaintiffs' books and records to determine the extent of damages; and (14) a request for injunctive relief. *See* Countercl. ¶¶ 77-162.

Defendant then filed a motion for a preliminary injunction against each Plaintiff on April 18, 2016. *See* Mot. for Prelim. Inj., ECF No. 8. In its motions Cumulus requests orders preliminarily enjoining Plaintiffs from using Cumulus's confidential information and soliciting Cumulus's advertisers, requiring Plaintiffs to make a detailed accounting of income generated from the internet show, requiring Plaintiffs to return any and all of Cumulus's proprietary and confidential documentation, allowing the parties to immediately commence discovery, and directing the payment of fees and costs. *Id*.  As to Holzhei alone Defendant also seeks an order preliminarily enjoining her from continuing to violate her non-compete agreement.

## II.

A preliminary injunction is an extraordinary remedy "which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). To determine whether a preliminary injunction should issue, the Court must consider four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007). These four factors "are factors to be balanced not prerequisites that must be met." *Six Clinics Holding Corp., II v. Cafcomp Syst.*, 119 F.3d 393, 400 (6th Cir. 1997).

- 14 -

**A.**

Defendant first argues that a preliminary injunction should be entered as to its claim that Holzhei breached the non-compete provision of her contract. To establish a breach of contract claim under Michigan law, a claimant must demonstrate "(1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Dunn v. Bennett*, 846 N.W.2d 75 (Mich.Ct.App.2013).

Agreements not to compete are specifically authorized under Michigan law in the following circumstances:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

M.C.L. § 445.774a. While agreements limiting competition are expressly authorized by statute, they are disfavored in Michigan as restraints on commerce, and are only enforceable to the extent they are reasonable. *See Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 545 (Mich. Ct. App. 2007). "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *St. Clair Med., P.C. v. Borgiel*, 270 715 N.W.2d 914, 919 (Mich. Ct. App. 2006). "The burden of demonstrating the validity of the agreement is on the party seeking enforcement." *Coates,* 741 N.W.2d at 545.

- 15 -

While Defendant does not seek to enforce Burke's non-compete agreement because it has elected not to pay Burke the compensation required by his agreement, Defendant does seek to enforce the provision of Holzhei's employment agreement prohibiting her from competing against Cumulus within a year of her termination. That provision prohibits Holzhei from "appearing, performing, or allowing Employee's voice or picture to be heard, broadcast, used, or transmitted live or by recording in or on any radio station located within the Restricted Area." H. Employment Agreement ¶12(b).  That section specifically defines "any radio station located within[ ] the Restricted Area" as "a radio station whose main transmitter is located within a sixty (60) mile radius of the Station's main transmitter…." *Id*. Unlike the non-compete agreement found in Burke's employment agreement, Holzhei's non-compete agreement does not contain language prohibiting her from engaging in business that is "essentially the same" as a radio business.

Plaintiff alleges that the non-compete covenant does not apply because the Internet Show is not a "radio station" as defined by the contract. Plaintiff also argues that internet streaming is significantly different from heavily regulated, geographically limited radio activities.  Plaintiff is correct that the language of the employment agreement only prohibits Holzhei from engaging in competitive radio business for a period of one year.  It does not apply to broadcasts on any other medium, including television or internet. Holzhei's non-compete agreement does not apply to her conduct related to the Internet Show.

**B.**

As explained above, Holzhei's non-compete agreement does not apply to her activities with the Internet Show, and Cumulus has not paid for the right to exercise Burke's non-compete agreement. For these reasons, Burke and Holzhei are allowed to engage in competition with

Defendant.  In order to succeed in restraining Plaintiffs' competition, then, Cumulus must show that some aspect of the competition is in violation of another express contract term restricting competition or otherwise prohibited by law.

### i.

Defendant posits a number of theories as to how Plaintiffs' competition is in violation of express contract terms between the parties.  First, Cumulus argues that Plaintiffs have breached the provisions of their employment agreements requiring them to maintain Cumulus's confidential information. In its papers Cumulus does not identify any particular way in which Plaintiffs have failed to maintain confidentiality, arguing generally that Plaintiffs are using its confidential, proprietary information and trade secrets in broadcasting the Internet Show, as evidenced by the similarities between that show and the former Radio Show. However, the general format of the Radio Show is not proprietary or confidential by its very nature, given that it is broadcasted to the public. Defendants thus cannot argue that they made any effort to keep the Radio Show format secret.

At the preliminary injunction hearing, Defendant argued that both Plaintiffs had access to Cumulus's shared drive that contains confidential information.  Cumulus also argued that Plaintiffs had access to proprietary Neilson ratings for which Cumulus paid around $10,000 a month, that Plaintiff's had access to "Remote Sheets" containing confidential information regarding customer pricing, and that Plaintiffs were provided with confidential show prep services while employed at Cumulus.  Even assuming that Plaintiffs had access to this confidential information, Defendant has presented no evidence that Plaintiffs used, much less wrongfully used that information in producing their Internet Show. The mere fact that Plaintiffs have advertisers on the Internet Show does not mean that they wrongfully used confidential

information to obtain those advertisers. Similarly, the mere fact that Cumulus purchased show prep services for Plaintiffs during their employment does not mean that Plaintiffs are prohibited from purchasing their own show prep services for the Internet Show. Indeed, Burke testified that he currently subscribes to his own show prep services for the Internet Show. Because Defendant has not established that the confidentiality provisions were breached, it has not shown a likelihood of success on its claims that Plaintiffs breached contract provisions requiring them to maintain the confidentiality of Cumulus's information.

### ii.

Defendant also argues that it is likely to succeed on the merits of its claim that Plaintiffs breached the provisions of their employment agreements prohibiting them from soliciting Cumulus's employees by contracting with each other to perform the Internet Show. At the hearing, Burke and Holzhei each testified that they did not discuss webcasting the Internet show until after their employment with Cumulus had been terminated. Burke alone was involved in the initial Internet Show webcast, which took place the Tuesday following Plaintiffs' termination. Holzhei testified that Burke invited her to join him in webcasting the Internet Show in order to say goodbye to their former listeners, and that the Internet Show then evolved into a program in its own right. In its reply, Defendant concedes that Holzhei did not agree to join Burke in broadcasting the Internet Show until "after her employment with Cumulus ended." *See* Reply 7, ECF No. 17.

The non-solicitation provision in Burke's contract prevents him from soliciting for a period of six months "any of [Cumulus's] sales, programming, managerial, or on-air employees with whom Employee dealt with during the 12 months preceding Employee's termination of employment with [Cumulus]." B. Employment Agreement. ¶ 4. By its terms, Burke's non-

solicitation has not been violated, as Holzhei was not an employee of Cumulus when he invited her to take part in the Internet Show. The provision of Burke's contract prohibiting solicitation of employees applies to just that – employees.  Nothing in that agreement prevents Burke from soliciting Cumulus's former employees.

The non-solicitation provision found in Holzhei's employment agreement is more restrictive than the one found in Burke's.  That provision prohibits her from soliciting "any person who is at the time or within the immediately preceding thirty (30) days was an employee of Employer" for a period of one year after the termination of her employment. The provision defines "solicit" to include the following: "(i) hire or employ, offer to hire or employ, or attempt to hire or employ; (ii) assist any person in hiring or employing; (iii) contract with; or (iv) induce to leave employment." H. Employment Agreement ¶ 13. Because Defendant has presented no evidence that the first, third, or fourth definitions of solicit apply, Defendant's claim must rest on the third definition of solicitation.

Defendant has shown a likelihood of success on this claim.  By agreeing to webcast the Internet Show with Burke, Holzhei entered into an agreement, however informal, with Burke, who at the time had been employed by Cumulus within the immediately preceding thirty days. Plaintiff Holzhei has not objected to the enforceability of the non-solicitation provision or its broad definitions of "solicitation".  Defendant has therefore demonstrated a likelihood of success on this claim.

### iii.

Next, Defendant argues that it is likely to succeed on the merits of its claims that Plaintiffs breached the provisions of their contracts prohibiting them from soliciting Cumulus's customers. Plaintiffs do not dispute that they obtained sponsors, some of which had previously

advertised with Cumulus.  Again, because there are no non-compete agreements at issue in this case, Plaintiffs are allowed to generally compete with Defendant, and are thus allowed to solicit advertisers.  Plaintiffs simply may not solicit advertisers in violation of their contractual agreements with Defendant not to solicit Defendant Cumulus's customers/advertisers.

Plaintiffs contend that any solicitations are not in violation of the contracts because the internet webcast is not a business that is "competitive" with Cumulus under the agreements, as evidenced by the agreements' geographic scopes.  Plaintiffs also argue that they did not breach the non-solicitation provisions because Defendant Cumulus's former advertisers voluntarily approached them without any solicitation on Plaintiffs' part.

### 1.

In terms of form and content, the radio show and the internet show are similar.  Both are audio shows, aired in the morning, and featuring Burke and Holzei.  While the Internet Show features some different segments, different types of music, and no recorded commercials, Burke has admitted that he uses segments on his Internet Show that were formerly featured on the Radio Show. *See* Burke Aff., ECF No. 13 Ex. A. Despite the fact that the Internet Show does not contain any recorded commercials, it still features advertising in exchange for sponsorship. *Id.* Fundamentally, both shows are morning audio shows that follow a commercial talk show format.

Plaintiffs argue that, despite these similarities, the Internet Show cannot be considered "competitive" with Defendant's radio business because the content is broadcast by a different vehicle: namely internet streaming instead of radio waves. In support of this claim Plaintiffs emphasize numerous cases that distinguish the FCC's licensing and regulation requirements from the open and unregulated internet.  *See, e.g., Reno v. ACLU,* 521 U.S. 844, 869 (1997) (noting that the internet is not supervised by a federal agency), *Comcast Corp. v. FCC*, 600 F.3d

642, 646 (D.C. Cir. 2010) (vacating an attempted regulatory order over the Internet).  They also point to regulations suggesting that the term "commercial radio stations" refers only to AM or FM radio broadcasts. *See* 47 C.F.R. 73.3555 (limiting local ownership for AM and FM radio broadcast stations).

Plaintiffs also emphasize a non-binding 2012 case decided in Ohio state court, *Deluca v. D.A. Peterson, Inc*.  In *Deluca*, like in the present case, the plaintiffs were two morning radio hosts for an FM radio station whose employment contracts were subject to non-compete agreements.  *Id*.  After their contracts with the radio station expired, the plaintiffs began broadcasting an audio show via internet podcasts three mornings per week.  *Id*. 3 After the plaintiffs brought suit, the defendant counterclaimed that the plaintiffs were in breach of the parties' non-compete agreement that prevented them from engaging in the same or "essentially the same" business for a given period, and moved for an order preliminarily enjoining the plaintiffs from broadcasting their internet audio show.  The Ohio state court concluded that the plaintiffs' internet webcast could not be considered the same or essentially the same business as the defendant's radio business. *Id*. at 7. In so finding, the Ohio state court found the fact that radio broadcasts were subject to different regulations than internet broadcasts persuasive. *Id*.

Defendant responds that differences in regulatory structure between internet and radio broadcasts are irrelevant for the purpose of considering whether Plaintiffs are carrying on a business that is competitive with Cumulus's business. Defendant is correct.  To hold otherwise would be to elevate form over substance and ignore the economic realities of an industry that is increasingly shifting to the internet medium.  The Internet Show is "competitive" with the Radio Show.

**2.**

Plaintiffs next argue that, because internet signals have no geographic limits, the geographic scope of the Non-Compete Agreement is unreasonable as applied to the Internet Show. This argument is somewhat in conflict with Burke's admissions that the Internet Show features "local homegrown artists", presumably from the Saginaw area, and that they use many of the same segments from the former radio show. *See* Burke Aff., ECF No. 13 Ex. A. The fact that the Internet has a global reach does not mean that producers of internet media may not have a local target audience, and in fact may.  Evidence suggesting that Plaintiffs' show targets customers, advertisers, and listeners within the radius established by the Employment Agreement weighs in favor of Defendant Cumulus.

**3.**

Finally, Plaintiffs argue that they have not solicited any of Cumulus's sponsors in violation of the employment agreements because all of the Internet Show sponsors have initiated the advertising relationship.  *See* Burke Aff. 7.  At the preliminary injunction hearing Defendants presented some evidence that Plaintiffs had developed advertising relationships with customers that previously advertised with Cumulus.  However, Defendant presented no evidence that those relationships were the result of contractually prohibited conduct on the part of Plaintiffs.  Instead, with the exception of their agent Katherine Best's attempt to solicit B's Boutique, the testimony consistently demonstrated that all advertisers had initiated their relationships with Plaintiffs, not the other way around.  Defendant has therefore only shown a likelihood of success on a narrow claim that Plaintiff's attempted to solicit B's Boutique in violation of their contracts.

**iv.**

Finally, Defendant alleges that it is likely to succeed on the merits of its claim that Holzhei breached the provision of her contract prohibiting her use of Cumulus's intellectual property. *See* H. Employment Agreement ¶ 15. Defendant does not raise a similar claim against Plaintiff Burke because there is no comparable provision in his employment agreement. Defendant argues that Holzhei is using protected programming and segments owned by Cumulus, and that she continues to impermissibly go by the name "Blondie" on the Internet Show.

Defendant has not shown a likelihood of success on its claim that Holzhei has breached her employment agreement by continuing to go by the nickname Blondie.  Defendant presented no evidence that it developed the nickname or any features of the Blondie character.  Instead, it is undisputed that Blondie has been Holzhei's nickname since she was a child.  Because there is no evidence that the nickname Blondie was "created or developed" pursuant to Holzhei's employment with Cumulus, her continued use of that name is not prohibited by her employment agreement. H. Employment Agreement ¶ 15(a).

Defendant also argues that Holzhei's breached this provision of her employment agreement by holding a promotional bus tour similar to promotional bus tours Cumulus had held. Defendant presented no evidence that it had any intellectual property rights to the bus tour event. Instead, Defendant's witness testified that bus tours are a somewhat common event in the radio industry.

Defendant Cumulus also presented no evidence that Plaintiffs use any show segments owned by Cumulus.  Burke testified that Plaintiffs continue to use "The Friday Morning Primal Scream" and "The Butthead Bulletin" segments. Importantly, however, Defendant did not refute

Burke's testimony that he created those segments prior to his employment with Cumulus. Accordingly, there is no evidence that those segments were "created or developed" pursuant to Holzhei's employment agreement. The only segment used by Plaintiffs on the Internet Show that was arguably created during the course of their employment with Cumulus is "The Tweet of the Day" segment.  Defendant presented some evidence that Plaintiffs developed that segment with the help of Cumulus show prep services. Defendant has shown a substantial likelihood of success only on the narrow claim that the continued to use the "Tweet of the Day" segment is wrongful under Holzhei's employment agreement. *See* H. Employment Agreement ¶ 15(a).

### B.

In addition to its breach of contract claims, Defendant argues that Plaintiffs' competition is otherwise unfair or prohibited under various Michigan and federal laws.  Defendant first argues that there is a substantial likelihood that it will succeed on its claim that Plaintiffs misappropriated trade secrets in violation of UTSA. UTSA defines "Trade secret" as information, including a formula, program, method, technique or process, that both "(i) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "(ii) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." M.C.L. § 445.1902(d).  UTSA specifically authorizes the entry of injunctions where there is actual or threatened misappropriation. *See* M.C.L. § 445.1903.

Cumulus again argues generally that Plaintiffs have used its confidential, proprietary information and trade secrets by mirroring the radio show's format, content, and personas and by openly exploiting Cumulus' social media accounts to promote its internet show.  As explained above, the general format of the Radio Show is not protected by the UTSA because Defendant

has taken no steps to keep the format secret.  And while exploitation of social media accounts may be in violation of some other law, it does not fall within the parameters of the UTSA.  In these regards Cumulus has not identified any information that is not generally known or readily ascertainable, nor any reasonable efforts it has undertaken to maintain the secrecy of such information.

Cumulus again argues that Plaintiffs' access to confidential information such as Nielson Ratings and Remote Sheets demonstrate a likelihood of success on its UTSA claims.  As discussed above, while Cumulus has argued that Plaintiffs had access to confidential information such as Nielson Ratings and Remote Sheets, Cumulus has presented no evidence that Plaintiffs wrongfully used such confidential information.  Defendant therefore has not presented sufficient evidence to demonstrate a likelihood of success on its UTSA claims.

### C.

Defendant Cumulus also alleges that there is a substantial likelihood that it will succeed on its claim of statutory conversion under Michigan law. Michigan Compiled Law § 600.2919(a)(1) authorizes treble damages, along with costs and reasonable attorney fees, where a party proves it was damaged by "[a]nother person's stealing or embezzling property or converting property to the other person's own use."  *Id.*

As discussed above, Defendant has not demonstrated a likelihood of success on its claims that Plaintiffs have wrongfully used confidential information such as Neilson Ratings or Remote Sheets.  Defendant also has not demonstrated a likelihood of success on its claims that Holzhei's use of the nickname Blondie is wrongful, or that the Plaintiffs' continued use of "The Friday Morning Primal Scream" and "The Butthead Bulletin" segments is wrongful. While Defendant attempted to argue that Plaintiffs had wrongfully converted a photograph from its website,

Defendant did not rebut Plaintiffs' suggestion that they obtained the photograph from the photographer: the actual owner of the photograph. The only intellectual property arguably converted by Plaintiffs is "The Tweet of the Day" segment and Burke's use of the call sign WHNN in his Twitter and Periscope accounts.

**D.**

Defendant Cumulus also alleges that Plaintiffs are engaging in unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).[1] The Lanham Act provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.* The Lanham Act prohibits "false or misleading representation[s] of fact" in commercial advertising, and applies to qualified unregistered trademarks. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768-69, (1992).

---

[1] Defendant has brought three counterclaims under the Lanham Act. As its fifth counterclaim Defendant claims "Unfair Competition" under 15 U.S.C. 1125(a). Defendant's eighth counterclaim falling under the "Anti Cybersquatting Protection Act" relates to Burke's Twitter and Periscope activities and again cites 15 U.S.C. 1125(a). Finally, Defendant's ninth counterclaim alleges "Trademark infringement" based on the same activities under the same act.

**i.**

In order to establish a claim under the act, Cumulus first must establish the existence of a valid and legally protectable trademark qualifying under § 2 of the Lanham Act. *See DeGidio v. W. Grp. Corp*., 355 F.3d 506, 509 (6th Cir. 2004). To do so, Cumulus must demonstrate a mark that "(1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos,* 505 U.S. at 7. Marks that are "arbitrary," "fanciful," or "suggestive" are likely to be "inherently distinctive" and protectable. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 512 (6th Cir. 2007). On the other hand, generic terms almost never qualify for trademark protection. *Id.* Falling between these two poles are marks that are descriptive but not inherently distinctive, which may be protectable under the act if they develop a secondary meaning. *Id.*

Plaintiffs do not dispute Defendant's claim that the WHNN mark is distinctive such that it is a qualified unregistered mark subject to protection under the Act, and indeed, WHNN is a qualifying mark under the act. Defendant's claim that Holzhei's nickname "Blondie" constitutes a qualified unregistered trademark is without merit. Blondie is not a distinctive mark, but instead a generic and descriptive name for women with blonde hair. Nor has Defendant shown that "Blondie" has acquired secondary meaning. Finally, as discussed above, Defendant has not shown any proprietary interest in Holzhei's nickname "Blondie" since it is undisputed that it has been Holzhei's nickname since she was a child, and there is no evidence that the nickname Blondie was created or developed pursuant to Holzhei's employment agreement with Cumulus.

**ii.**

Having demonstrated that the call sign WHNN is a qualifying unregistered trademark, Cumulus next must show that Burke's use of the WHNN mark is "likely to cause confusion or to

cause mistake". *See Two Pesos*, 505 U.S. at 768-69 (holding likelihood of confusion is the critical element of federal trademark infringement claim). Defendant emphasizes the fact that Burke continued to use Cumulus's call sign WHNN as part of his personal Twitter handle and Periscope username.  At the hearing Burke testified that he had been unable to change his Twitter handle on his own, and that he had to contact Twitter support to have the handle changed.  Burke testified that the change was accomplished at some time in April, and that WHNN no longer appears on either his Twitter or Periscope account.

Defendant alleges that Plaintiffs' continuing use of its "Facebook page, pictures, call sign, programming, promotional materials, show elements, and events" is likely to cause confusion or mistake concerning the origin of the services and goods. *See* Compl. ¶¶ 98-104.  At the hearing, Defendant also emphasized an April Fool's Day incident in which Plaintiffs broadcasted their internet show from Cumulus's parking lot after days of teasing their listeners that they were "returning to WHNN."  Having shown both a qualifying mark and a likelihood of confusion, Defendant has established a likelihood of success on this claim.

## E.

Relatedly, Defendant Cumulus alleges that it is likely to succeed on its claim that Plaintiffs will be unjustly enriched if allowed to continue their unfair competition. Unjust enrichment is a common law remedy whereby the law implies a contract in order to prevent unjust enrichment, specifically when one party inequitably receives and retains a benefit from another. *See Martin v. East Lansing School Dist.*, 483 N.W.2d 656 (Mich. Ct. App. 1992). To proceed on such a claim, a plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (Mich. Ct. App. 1993). "However, a

contract will be implied only if there is no express contract covering the same subject matter." *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271 (Mich. Ct. App. 2003).  In other words, the law will not imply a contract where there is an express contract between the same parties on the same subject matter. *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898 (Mich. Ct. App. 2006) (quoting 42 CJS IMPLIED AND CONSTRUCTIVE CONTRACTS § 34, p. 33).

It is undisputed that express contracts exist between Plaintiff and Defendant concerning anti-competitive behavior.  The employment agreements specifically address Plaintiffs' duties to maintain Cumulus's confidential information and the limits on their ability to compete with Cumulus following the termination of the employment relationships.  The employment agreements also establish remedies in the event they are breached.  Because an express contract exists between the parties, Defendant cannot prevail on its claim of unjust enrichment.

**F.**

Defendant also argues that its tortious interference claims can form the basis for its request for injunctive relief. In its counterclaims Defendant alleges both tortious interference with a contractual relationship and tortious interference with a business relationship or expectancy.

**i.**

With regard to its claims that Plaintiffs tortuously interference with contractual relationships, Cumulus argues that Plaintiffs tortuously interfered with each other's contracts limiting post-employment competition.  To proceed on a claim of tortious interference with a contractual relationship, a plaintiff must establish three elements: "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the [interferer]."

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 706 N.W.2d 843, 849 (Mich. 2005).

Defendant's claim that Holzhei interfered with Burke's employment agreement depends on the breach of contract analysis found in Part II.B. infra.  That analysis shows Cumulus is only likely to succeed on the single breach of contract theory that Burke wrongfully solicited B's Boutiques.  To establish a claim of tortious interference against Holzhei, then, Defendant must show that this breach was instigated by Holzhei.  Defendant has not even alleged that the solicitation of B's Boutiques for the Internet Show bus tour was instigated by Holzhei. Defendant is therefore unlikely to succeed on its claim that Holzhei tortuously interfered with Burke's employment agreement.

Defendant is more likely to succeed on its claim that Plaintiff Burke tortuously interfered with Plaintiff Holzhei's employment agreement. As demonstrated above, Cumulus is likely to succeed on its claims that Holzhei breached her employment agreement in the following ways: (1) soliciting B's boutiques; (2) soliciting (or contracting with) Burke within 30 days of the termination of his employment with Cumulus; and (3) continuing to employ "The Tweet of the Day" segment. Defendant also presented evidence that those breaches were at the instigation of Burke, who initially invited Holzhei to take part in the Periscope webcast, and who was referred to as "the leader of the pack" at the hearing.

### ii.

With regard to its tortuous interference with valid business expectancy claims, Defendant Cumulus alleges that Plaintiffs interfered with relationships Cumulus had with its customers and suppliers. The elements of tortious interference with a business relationship or expectancy are "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated

on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. *Id.* at 849.

Defendant alleges that Plaintiffs were aware of its relationships with its sponsors and customers, that Plaintiffs intentionally interfered with those relationships, and that Defendant has been harmed by the interference. As explained above, with the exception of Katherine Best's attempt to solicit B's Boutique, the testimony consistently demonstrated that all advertisers had initiated their relationships with Plaintiffs, and that there was no wrongful solicitation on the part of Plaintiffs. Defendant has not shown a strong likelihood of success on its claim that Plaintiffs tortuously interfered with its business relationship with B's Boutique because Defendant has claimed neither a breach nor termination of its business expectancy with B's Boutique or any resulting damage.

### III.

The first preliminary injunction factor required the Court to consider Defendant Cumulus's likelihood of success on the merits of its various claims. From that analysis, it appears that Cumulus has a likelihood of success on the following claims against Plaintiff Burke: (1) Breach of contractual provision preventing him from soliciting customers based on the solicitation of B's Boutique; (2) violation of the Lanham Act based on Plaintiffs' use of the WHNN call sign; and (3) tortious interference with Holzhei's employment agreement with Cumulus. Cumulus has also demonstrated a strong likelihood of success on the following claims against Plaintiff Holzhei: (1) Breach of contractual provision preventing her from soliciting customers based on the solicitation of B's Boutique; (2) Breach of contractual provision

preventing her from soliciting former Cumulus employees based on her contracting with Burke; (3) Breach of contractual provision preventing her from using Cumulus's intellectual property based on the continued use of "The Tweet of the Day"; and (4) Violation of the Lanham Act based on Plaintiffs' use of the WHNN call sign. Defendant has also shown some likelihood of success on its claims of statutory conversion and tortious interference with business expectancies against both Plaintiffs.

The next relevant factor is whether the movant will suffer irreparable harm without the injunction. *See Workman,* 486 F.3d at 905. As part of their employment agreements, both Burke and Holzhei agreed that any breach of their employment agreements would result in irreparable harm to Defendant, in which case Defendant would be entitled to injunctive relief to enforce the employment agreements. *See* H. Employment Agreement ¶ 18; B. Employment Agreement ¶ 8. As part of their employment with Defendant, Plaintiffs thus agreed to the satisfaction of the second preliminary injunction factor as it pertains to any violations of the employment agreements. Burke thus effectively agreed that his solicitation of Defendant's former sponsors would cause Defendant irreparable harm warranting an injunction. For her part, Holzhei effectively agreed that soliciting Defendant's former sponsors, contracting with Burke within 30-days of the termination of his employment with Cumulus, and continued use of "The Tweet of the Day segment" would cause Defendant irreparable harm warranting an injunction. The Court notes however that the 30-day period in which Holzhei was prevented from contracting with Burke has passed, and therefore any further collaboration between Burke and Holzhei will not fall within the contractual prohibition. Thus while Defendant may be entitled to damages from her breach of that agreement, there is no contractual justification for enjoining future collaborations.

While it does not fall within the preliminary injunction clause of Burke's contract, Plaintiff's use of the WHNN call sign is also likely to cause Defendant irreparable harm to the likelihood of confusion of sponsors and listeners alike.

### III.

The third preliminary injunction factor is whether granting the injunction will cause substantial harm to others.  Neither Burke nor Holzhei has shown that substantial harm will result if they are enjoined from soliciting Defendant's current and former advertisers as set forth in their respective employment agreements, or if they are enjoined from continuing to use "The Tweet of the Day" segment, or any other segment created or developed pursuant to their employment agreements. Plaintiffs have also not shown that they will be substantially harmed if enjoined from using the WHNN call sign.  On the other hand, Plaintiff Holzhei would be substantially harmed if prevented from using her nickname "Blondie" or from entering into any future agreements with Burke.

### IV.

Finally, issuing a preliminary injunction in these limited ways will not negatively impact the public interest.  Agreements that reasonably restrain competition in order to protect an employer's legitimate business interests are specifically authorized under Michigan law, thus enforcing such contractual provisions is in the public interest.  Similarly, protecting valid intellectual property rights, contractual relationships, and business expectancies is in the public interest.

**V.**

Accordingly, it is **ORDERED** that Defendant Cumulus's motions for preliminary injunctions as to each Plaintiff, ECF No. 8, are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Plaintiffs Burke and Holzhei are **PRELIMINARILY ENJOINED** from soliciting Cumulus's current and former advertisers as specified in their respective employment agreements, including B's Boutique.

It is further **ORDERED** that Plaintiffs Burke and Holzhei are **PRELIMINARILY ENJOINED** from using the WHNN call sign, or making any false representation during their program that they are or will be "returning to WHNN."

It is further **ORDERED** that Plaintiffs Burke and Holzhei are **PRELIMIARILY ENJOINED** from using "The Tweet of the Day" segment, or any other segment created or developed pursuant to the terms of their employment with Defendant.

It is further **ORDERED** that Defendant Cumulus's request for the immediate commencement of discovery is **DENIED as moot**.

It is further **ORDERED** that Defendant Cumulus's request to preliminarily enjoin Holzhei from using the nickname "Blondie" is **DENIED.**

It is further **ORDERED** that Defendant Cumulus's request to require Plaintiffs to make a detailed accounting of income generated from their competing activities is **DENIED without prejudice.**

It is further **ORDERED** that Defendant Cumulus's request that it be awarded attorney's fees, costs, and interest under ¶ 17 of Plaintiff Holzhei's employment agreement is **DENIED without prejudice.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 15, 2016

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 15, 2016.

s/Julie Owens
JULIE OWENS, Case Manager
Acting in the absence of Michael Sian